## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE No.: 1:20-cv-22914-WPD/Becerra

IBRAHIM CRUZ,

     Plaintiff,

v.

ANDREW SAUL,
Commissioner of Social Security Administration,

     Defendant.

_____/

## REPORT AND RECOMMENDATION[1]
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT

     **THIS CAUSE** came before the Court on the Parties' cross motions for summary judgment. Plaintiff Ibrahim Cruz ("Plaintiff") filed his Motion for Summary Judgment with Supporting Memorandum of Law ("Plaintiff's Motion").  ECF No. [27].  Defendant Andrew Saul ("Defendant" or "Commissioner") filed his Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment.  ECF Nos. [28], [29].[2]  The Court must now determine whether the decision reached by the Administrative Law Judge ("ALJ") is supported by substantial evidence and whether the correct legal standards were applied.  After a review of the Motions, the record, and all relevant authorities, the undersigned hereby **RECOMMENDS** that Plaintiff's Motion be **DENIED** and that Defendant's Motion be **GRANTED**.

---

[1] This matter was referred to the undersigned for appropriate disposition or report and recommendation.  ECF No. [5].

[2] Although the Docket reflects that Defendant filed a separate Response to Plaintiff's Motion for Summary Judgment, ECF No. [29], it is the same document as Defendant's Motion, ECF No. [28].

## I.      BACKGROUND

Plaintiff filed two Title II applications for Social Security Disability Insurance benefits, each concerning a different period of disability.  *See* R. at 879.[3]  The petition as to the first period, which is what is at issue in the instant case, concerns a disability period from October 5, 2010 through May 23, 2014 (the "First Disability Period").  *Id.* at 907.[4]  The second petition concerns a disability period beginning on May 24, 2014 (the "Second Disability Period").  *Id.* at 1021.  As noted below, Plaintiff has been found disabled for the Second Disability Period.  *Id.* at 1028.

### A.  The First Disability Period

As to the petition for the First Disability Period, the Commissioner denied Plaintiff's claim on July 22, 2012, *id.* at 90–91, and again, upon reconsideration, on October 8, 2012, *id.* at 104–05.  Plaintiff subsequently requested a hearing, which took place via video teleconference on May 6, 2014.  *Id.* at 49–51, 124.  Plaintiff, represented by counsel, testified at the hearing.  *Id.* at 51.  Cheryl Ann Vesser, a vocational expert ("VE"), also appeared and testified at the May 6, 2014 hearing.  *Id.*  On May 23, 2014, the ALJ issued a decision denying Plaintiff's application and finding that Plaintiff was not disabled from the alleged onset date through May 23, 2014, the date of the decision.  *Id.* at 29–41.  Upon receiving the unfavorable ruling by the ALJ, Plaintiff appealed the ALJ's decision to the Appeals Council ("Council") on June 27, 2014.  *Id.* at 23–28.  On February 18, 2016, the Council denied review of the ALJ's decision, stating there was no basis for changing the decision.  *Id.* at 9–11.  Having exhausted all available administrative remedies and pursuant to 42 U.S.C. § 405(g), Plaintiff appealed to this Court on April 12, 2016.  *See* Complaint,

---

[3] References herein to "R. at __" are to the Social Security record, the pertinent parts of which can be found at ECF No. [23].  All the page numbers refer to those assigned by the electronic docketing system, as found on the top right corner of the page.

[4] Originally, Plaintiff alleged a disability onset date of September 11, 2009, however that onset date was later amended to October 5, 2010.  R. at 193, 907.

*Cruz v. Berryhill*, No. 16-cv-21307-KMM (S.D. Fla. April 12, 2016), ECF No. [1].  On August 28, 2017, United States Magistrate Judge Chris M. McAliley issued a Report and Recommendation, recommending that the ALJ's decision be remanded to weigh the opinions of Dr. Jose E. Jaen ("Dr. Jaen") and Dr. Julio D. Torres ("Dr. Torres") and to properly assess Plaintiff's sleep apnea and the status of his right knee after his knee replacement surgery.  *See* Report and Recommendation at 11, *Cruz v. Berryhill*, No. 16-cv-21307-KMM (S.D. Fla. Aug. 28, 2017), ECF No. [29].  In addition, Judge McAliley recommended that the ALJ should explicitly state the weight assigned to the opinions of Dr. Allan Jorge ("Dr. Jorge"), Dr. Daniel Marin ("Dr. Marin"), and Dr. Jan Pieter Hommen ("Dr. Hommen").  *Id.* at 8.  Thereafter, the District Court adopted the Report and Recommendation and remanded the matter for further proceedings.  *See* Order Adopting Report and Recommendation, *Cruz v. Berryhill*, No. 16-cv-21307-KMM (S.D. Fla. Sept. 21, 2017), ECF No. [30].

### 1.     The ALJ Hearing On Remand

On May 22, 2019, Plaintiff, represented by counsel, appeared before an ALJ at a hearing following the District Court's remand.  *Id.* at 905.  At the hearing, the ALJ noted that the disability period before him was the First Disability Period, which was between October 5, 2010 and May 23, 2014.  *Id.* at 909.  Moreover, the ALJ identified the issues on remand as: "the prior [ALJ's] failure to address [the opinions of] Dr. [Jaen] [] and Dr. Torres [] and the failure to identify the claimant's right knee arthroplasty and sleep apnea as severe impairments."  *Id.*  The ALJ further noted the District Court's indication that the prior ALJ "properly assessed but could have done a better job of identifying and weighing" the opinions of Dr. Jorge, Dr. Marin, and Dr. Hommen. *Id.* at 909–10.  Plaintiff's counsel stated that Plaintiff was between the ages of fifty and fifty-four during the period at issue.  *Id.* at 910.  Plaintiff completed his high school education and obtained

his associate degree.  *Id.* at 910, 927.   From 2000 to 2009, Plaintiff worked as an order filler/merchandise pick up at Sears.  *Id.* at 910, 927–28.  Plaintiff's counsel noted that, during the period at issue, Plaintiff had a number of medically determinable impairments including history of head trauma, disorders of back-discogenic and degenerative disc disease ("DDD") of the lumbar spine, history of lumbar spine fusion of L4 and 5, and DDD of the cervical spine.  *Id.* at 910.  In addition, Plaintiff had mild to moderate rotator cuff tendonitis, a labral tear, and arthritis of the right shoulder.  *Id.* at 910–11.  Plaintiff also had a right knee replacement in January 2010.  *Id.* at 911.  Plaintiff also suffered from hypertension, gastroesophageal reflux disease ("GERD"), carpal tunnel syndrome, blindness in the left eye, sleep apnea, loss of the sense of smell and taste, difficulties concentrating, and obesity.  *Id.* at 911–14.

Plaintiff provided testimony pertaining to the First Disability Period.  *Id.* at 924–46. Plaintiff testified that he was only able to drive "on and off" because he experienced pain when sitting for an extended period of time.  *Id.* at 927.  He testified that he originally stopped working due to constant pain when sitting and standing.  *Id.* at 928–29.  Plaintiff proceeded to explain his inability to work, stating he was unable to sit or stand for more than five or ten minutes at a time, and that the medication he took to alleviate the pain prevented him from driving.  *Id.* at 929. Plaintiff identified that his knees and shoulders were his primary impairments during the period at issue.  *Id.*  As to Plaintiff's left knee, however, counsel confirmed that there were no medical examination reports diagnosing a pathology.  *Id.* at 931.

Plaintiff testified that, at the time, a typical day in his life began around three-thirty to four o'clock in the morning.  *Id.* at 935.  He remained seated on the couch or at the dining room table until his son woke up for school and he occasionally took his son to school.  *Id.*  Plaintiff stated that he spent the remainder of the day sitting, watching television, and walking around.  *Id.*

Plaintiff testified that he was unable to help around the house.  *Id.* at 936.  When asked whether Plaintiff went to the mall, park, or out to dinner, he stated, "on and off, yes."  *Id.*  Plaintiff stated that after five to ten minutes of walking, he needed to rest, and that he was only able to sit for about five minutes.  *Id.*  He testified that he was able to lift a maximum of twenty pounds without pain but clarified that his pain tolerance varied per day.  *Id.* at 937.  With respect to Plaintiff's right shoulder, arm, and hand injury, he testified that the shoulder problem was intermittent and that his shoulder dislocated by itself.  *Id.* at 938.  Plaintiff stated that at times, he was unable to lift his arm past his chest and was unable to lift his arm without pain radiating to his neck.  *Id.*  He also noted that occasionally things slipped out of his hands and broke.  *Id.* at 939.

Plaintiff testified that his doctors prescribed medication to alleviate his pain, but the medications caused constipation that hurt more than the pain they were intended to alleviate.  *Id.* Because of this side effect, Plaintiff threw away the prescribed medications.  *Id.*  Plaintiff also testified that one of his physicians treated him with nerve blocking injectables in the cervical spine and therapy, but both only provided relief for a few months.  *Id.* at 940.  Plaintiff also underwent a knee replacement, but he noted that the surgery only provided minimal improvement and that he was unable to kneel as a result of a sharp pain in his knee.  *Id.* at 940–41.  Plaintiff had lumbar spine fusion surgery to remedy the pain and numbness he was experiencing.  *Id.* at 941.  Plaintiff contended that following the surgery, he "improved somewhat."  *Id.*  However, the numbness persisted, and as such, the doctor indicated that more fusions were required.  *Id.*

When asked whether or not he was be able to perform a job that required him to stand for six hours and to be seated for two hours, Plaintiff stated he was unable to given his pain.  *Id.* at 942.  When subsequently asked whether or not he was able to make it through an eight-hour work

day with the ability to sit and stand as needed, Plaintiff responded the same, indicating that his

pain rendered him unable to perform the job despite the accommodation. *Id.* at 942–43.

The VE also testified at the hearing. *Id.* at 950. The ALJ asked the VE to classify Plaintiff's

past work as an order filler (DOT[5] No. 922.687-058). *Id.* at 952. The VE stated that his prior

position had an SVP[6] of two and medium exertion. *Id.* The ALJ asked the VE whether a

hypothetical individual capable of performing the full range of light work with the same medical,

educational, and vocational profile as Plaintiff could perform Plaintiff's past work if that

hypothetical individual: could never kneel or crouch; could occasionally crawl or stoop; could

occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could

frequently handle, finger, and feel; could frequently reach in all directions with the right arm but

only occasionally overhead; could never operate foot controls with the right foot; could never be

exposed to vibration, work at unprotected heights, or work with dangerous machinery; and could

never be exposed to noxious fumes, odors, or nasal irritants. *Id.* The VE answered in the negative,

stating that such hypothetical individual could not perform Plaintiff's past work because his past

work is greater than light. *Id.* at 953. The ALJ asked if this hypothetical individual could perform

any work in the national economy, and, if so, to provide three representative positions. *Id.* The

VE testified that such an individual could perform the following occupations: cashier II (DOT No.

211.462-010; light exertional level; SVP of 2; 876,000 positions in the national economy), sales

attendant (DOT No. 299.677-010; light exertional level; SVP of 2; 211,000 positions in the

national economy), and marker (DOT No. 209.587-034; light exertional level; SVP of 2; 311,000

positions in the national economy). *Id.* The ALJ told the VE to imagine a second hypothetical

---

[5] DOT refers to the Dictionary of Occupational Titles ("DOT").

[6] SVP refers the Specific Vocational Preparation ("SVP").

individual with the same medical, educational, and vocational profile as Plaintiff and subjected to the same limitations as the first hypothetical individual, except that this individual could never reach overhead with his right arm. *Id.* The ALJ asked whether this second hypothetical individual could perform any work in the national economy, and, if so, to provide three representative positions. *Id.* The VE replied that this hypothetical individual could still perform the positions of a cashier II and marker, and could perform the position of a router (DOT No. 222.587-038; light exertional level; SVP of 2; 39,800 positions in the national economy). *Id.* at 955. Lastly, the ALJ asked whether a third hypothetical individual with Plaintiff's medical, educational, and vocational profile and subject to the same limitations as the individual in the second hypothetical, except that the individual is limited to sedentary exertional work, could perform Plaintiff's past work. *Id.* The VE testified that the hypothetical individual would be unable to perform Plaintiff's past work. *Id.*

On cross-examination by Plaintiff's counsel, the VE testified that she used the Bureau of Labor Statistics as the source for the number of jobs in the national market she provided. *Id.* at 956. The VE also stated that she utilized the JobBrowser Pro Program to obtain those numbers. *Id.* Plaintiff's counsel asked the VE if she was aware of how JobBrowser Pro calculates the number of jobs available and where it obtains those numbers other than the Bureau of Labor Statistics. *Id.* After the VE attempted to explain the process, Plaintiff's counsel asked: "So would it be fair to say that you [do not] know exactly how they came up with those numbers?" *Id.* at 965–57. The VE responded: "No, they rely on statistics that are gathered by the Labor Department." *Id.* at 957. Plaintiff's counsel proceeded to ask if the VE could identify the methodology by which the Job Browser Pro statisticians manipulate the numbers from the Bureau of Labor Statistics. *Id.* The VE replied that she could obtain that information from Job BrowserPro and provide it. *Id.* Plaintiff's counsel stated: "I think [the VE] indicated that she cannot identify specifically what

[JobBrowser Pro's statisticians are] doing so she offered to provide us with that methodology. My point is if she [does not] know how [they are] getting the numbers[,] how can she verify the accuracy of those numbers[?]" *Id.* at 958. After the ALJ questioned the VE on the function of JobBrowser Pro, the ALJ asked whether JobBrowser Pro is typically relied on by vocational experts as a source of information concerning the availability of jobs. *Id.* at 959–60. The VE answered in the affirmative. *Id.* at 960.

The ALJ asked Plaintiff's counsel if it had reason to take issue with the information or the numbers generated by JobBrowser Pro. *Id.* at 960. Plaintiff's counsel replied in the affirmative, indicating that it took issue with the VE's testimony, which relied on JobBrowser Pro without understanding the methodology employed to calculate the number of jobs available. *Id.* at 960–61. When the ALJ inquired as to why the VE would have to know the methodology employed if such methodology generates reliable numbers, Plaintiff's counsel stated: "I have no way of knowing if [they are] reliable numbers." *Id.* at 961. The ALJ told Plaintiff's counsel to submit a brief detailing the objections to the methodology and numbers generated by JobBrowser Pro and to provide an explanation of how reliance on JobBrowser Pro would render a VE's testimony invalid.[7] *Id.* at 962. At the hearing, Plaintiff's counsel also explained that JobBrowser Pro allows users to manipulate North American Industrial Classification Systems codes, which may result in a change of the number of jobs available. *Id.* at 962–63. The VE testified that she did not manipulate the codes, and thus the numbers provided were the numbers generated by JobBrowser Pro. *Id.* at 963.

---

[7] Pursuant to the ALJ's request, Plaintiff's counsel submitted a brief outlining its position regarding the unreliability of job incidence data provided by the VE. *Id.* at 1150–69.

## 2.     The ALJ's Decision On Remand

On September 4, 2019, the ALJ issued a decision finding that Plaintiff did not qualify for disability insurance benefits for the First Disability Period. *Id.* at 894.  The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act during the First Disability Period, from October 5, 2010 through May 23, 2014. *Id.* at 893–94.  In reaching this decision, the ALJ applied the sequential evaluation process that must be used when considering claims for disability. *Id.* at 882–93; *see also* 20 C.F.R. § 404.1520.  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during the First Disability Period . *Id.* at 883.  At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: "upper extremity neuropathy; degenerative disc disease of the lumbar and cervical spine; radiculopathy; right shoulder (disorder) arthritis, cuff tendinitis and tear; degenerative joint disease of the bilateral knee; status/post right knee replacement; sleep apnea; obesity; carpal tunnel syndrome ("CTS"); chronic sinusitis and rhinitis; and hypertension." *Id.*  The ALJ found Plaintiff's visual limitation in the left eye not to be a medically determinable impairment. *Id.*  The ALJ further determined that Plaintiff's remote history of head trauma and history of hypercholesterol GERD were non-severe impairments. *Id.*  At step three, the ALJ considered the listing requirements and determined that Plaintiff did not meet or medically equal any of the relevant listings. *Id.* at 884.

Before moving to step four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform light work as defined in 20 CFR § 404.1567(b), [8] subject to the following additional limitations:

---

[8] "Light work involves lifting no more than [twenty] pounds at a time with frequent lifting or carrying of objects weighing up to [ten] pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do

> never kneel or crouch; occasionally crawl or stoop; occasionally climb ramps and stairs; and never climb ladders, ropes[,] or scaffolds.  [Plaintiff] could frequently handle, finger, and feel; frequently reach in all directions with the right arm, but never overhead; and never operate foot controls with the right foot.  He could never be exposed to vibration, noxious fumes, odors, nasal irritants, work at unprotected heights or work with dangerous machinery.

*Id.*  In determining Plaintiff's RFC, the ALJ "considered all [of Plaintiff's] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  *Id.*   The ALJ considered the opinion evidence in accordance with the requirements set forth in 20 C.F.R. § 404.1527.  *Id.*  At step four, the ALJ determined that Plaintiff was unable to perform his past relevant work as an order filler.  *Id.* at 892.  At step five, the ALJ relied on the VE's testimony to establish the existence of a significant number of jobs in the national economy which Plaintiff could perform, given his age, education, work experience, and RFC.  *Id.* at 892–93.  Specifically, the ALJ found that Plaintiff could perform the representative occupations of cashier II, router, and marker.  *Id.* at 893.  Based on the foregoing, the ALJ concluded that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act during the First Disability Period, and thus denied Plaintiff's claims for disability insurance benefits.  *Id.* at 893–94.

### B.  The Second Disability Period

On April 22, 2016, prior to this Court's adjudication of Plaintiff's claim regarding the First Disability Period, Plaintiff field a subsequent application for disability benefits regarding the Second Disability period, alleging a disability onset date of May 24, 2014.  *Id.* at 1021.

---

substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

On February 7, 2018, Plaintiff appeared before the same ALJ that heard his petition on remand for the First Disability Period for a hearing regarding the Second Disability Period. *Id.* at 1021.[9]  Plaintiff chose to proceed with the application as to the Second Disability Period "rather than wait for the Appeals Council to consolidate his claims" as to both disability periods. *Id.*  On April 4, 2018, the ALJ issued his decision, finding Plaintiff disabled from May 24, 2014. *Id.* at 1028.

Specifically, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 24, 2014, the alleged disability onset date. *Id.* at 1023.  At step two, the ALJ found that Plaintiff had severe impairments, including "degenerative disc disease of the lumbar and cervical spine, degenerative joint disease of the right shoulder, degenerative joint disease of the bilateral knees, and carpal tunnel of the right hand." *Id.*  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal the severity of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.* at 1024.  The ALJ evaluated Plaintiff's medical record and determined that Plaintiff had an RFC to perform sedentary work. *Id.* at 1024–27.  At step four, the ALJ determined that Plaintiff was unable to perform his past relevant work. *Id.* at 1027.  Finally, at step five, the ALJ determined that there were no jobs that existed in significant numbers in the national economy that Plaintiff could perform. *Id.*

## II.   STATUTORY FRAMEWORK AND STANDARD OF REVIEW

To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

---

[9] This hearing took place after this Court's remand regarding the First Disability Period but before the Appeals Council issued a remand order and before the hearing on remand took place. *Id.*

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).  Plaintiff bears the burden of proving that he is disabled, and he is responsible for producing evidence to support his claim. *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

The ALJ is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled. *See Frame v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x 908, 910 (11th Cir. 2015).  At step one, the ALJ must determine whether the claimant is currently unemployed; at step two, the ALJ must determine whether the claimant suffers from "severe"[10] impairment(s); at step three, the ALJ must determine whether the claimant suffers from an impairment that meets, or medically equals, a listed impairment found under 20 C.F.R. pt. 404, subpt. P, app. 1; at step four, the ALJ must determine whether the claimant is unable to return to his past relevant work given his RFC;[11] and if not, at step five, the ALJ must determine whether the claimant is unable to perform other work as it exists in the national economy, given his age, education, RFC, and work experience. *Id.*  While "[a]n affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability . . . [a] negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986) (citing 20 C.F.R. §

---

[10] An impairment is considered "severe" if it significantly limits a person's physical or mental ability to do basic work activities for a continuous period of at least twelve months.  20 C.F.R. §§ 404.1509, 404.1522(a)–(b).

[11] RFC is defined as the "most [a claimant] can still do despite [a claimant's physical and mental] limitations."  20 C.F.R § 416.945(a)(1).

416.920(a)–(f)).  "Once the finding is made that a claimant cannot return to prior work the burden

of proof shifts to the Secretary to show other work the claimant can do."  *Foote v. Chater*, 67 F.3d

1553, 1559 (11th Cir. 1995) (citing *Gibson v. Heckler*, 762 F.2d 1516, 1518 (11th Cir. 1985)).

Judicial review of an ALJ's final decision is limited to whether there is substantial evidence

in the record to support the ALJ's findings, and whether the correct legal standards were applied.

*See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Wilson v. Barnhart*, 284

F.3d 1219, 1221 (11th Cir. 2002).  "Substantial evidence is more than a scintilla, but less than a

preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to

support a conclusion."  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citing

*Richardson*, 402 U.S. at 401); *see also Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

In reviewing the ALJ's decision, a court is not to "reweigh the evidence" or "decide the

facts anew."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  Instead, so

long as the ALJ's findings are supported by substantial evidence, they are conclusive, and the

Court must defer to the ALJ's decision.  *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155,

1158–59 (11th Cir. 2004); *Hunter v. Comm'r, Soc. Sec. Admin.*, 808 F.3d 818, 822 (11th Cir.

2015).  Even if the Court finds that the evidence preponderates against the Commissioner's

decision, the Court must affirm the Commissioner's decision if the decision is supported by

substantial evidence.  *See Ellison*, 355 F.3d at 1275.  In this respect, "the ALJ has a basic obligation

to develop a full and fair record," given that a hearing before an ALJ is not an adversarial

proceeding.  *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  The Court also reviews the

ALJ's decision to determine whether the correct legal standards were applied.  *Id.*  However, no

presumption of validity attaches to the ALJ's conclusions of law.  *See Brown v. Sullivan*, 921 F.2d

1233, 1236 (11th Cir. 1991).

### III.    ANALYSIS

Plaintiff argues that remand is warranted on two grounds.  ECF No. [27] at 13–29.  First, Plaintiff contends that the ALJ's conclusion was not supported by substantial evidence because the ALJ relied on the VE's testimony, which "lacked a baseline of reliability." *Id.* at 22.  He states that the VE "failed by her own or other methodology to examine the validity of the jobs incidence data provided." *Id.*  Specifically, Plaintiff challenges the VE's reliance on Job Browser Pro as her method of calculating the job incidence data. *Id.* at 17.  Second, Plaintiff asserts that the ALJ's RFC finding is not supported by substantial evidence because the ALJ provided a deficient rationale for according less than substantial weight to his treating physicians. *Id.* at 23.  In arguing that this decision is not supported by substantial evidence, Plaintiff points to the inconsistency between the weight the ALJ provided the medical evidence in this case for the First Disability Period, and the weight the same ALJ provided the same evidence for the Second Disability Period. *Id.* at 22–29.

### A. The VE's Testimony Constitutes Substantial Evidence Upon Which The ALJ Could Properly Rely.

Upon determining that a claimant cannot return to his prior work, the Social Security Administration has the burden of establishing that other jobs exist in the national economy that Plaintiff can perform given his impairments. *See Foote*, 67 F.3d at 1559 (citing *Gibson*, 762 F.2d at 1518).  Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). "The Social Security Administration . . . 'approximates the number of positions that exist, whether vacant or filled, and without regard to the location of the work and a claimant's likelihood of being hired.'" *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1280 (11th Cir. 2020) (quoting *Chavez v. Berryhill*, 895 F.3d 962, 964 (7th Cir. 2018)).  To assist with step

five determinations, ALJs may utilize the services of a vocational expert or other specialist.  *See* 20 C.F.R. § 416.966(e).  Specifically, when making a step five determination, "the ALJ can consider both jobs data drawn from the DOT as well as from the testimony of the [vocational expert] in making this determination."  *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1360 (11th Cir. 2018).  The ALJ is required to identify specific jobs that the plaintiff is capable of performing, and that finding must be supported by substantial evidence.  *Teague v. Comm'r of Soc. Sec.*, 743 F. App'x 410, 411 (11th Cir. 2018).

To provide job incidence data, a vocational expert may reference governmental publications, including the DOT.  *See* 20 C.F.R. § 416.966(d)(1).  "The DOT groups jobs into 'occupations' based on their similarities and assigns each occupation a code number."  *Goode*, 966 F.3d at 1281.  The DOT remains one of the primary tools of vocational experts despite claims that it is outdated or obsolete, as the Department of Labor has failed to revise the DOT since 1991.  *Id.* (citing *Chavez*, 895 F.3d at 964–65); *see also Purdy v. Berryhill*, 887 F.3d 7, 14 n.10 (1st Cir. 2018) (noting the criticisms of the DOT).  In addition, the DOT does not provide statistical information on the jobs available in the national economy.  *Goode*, 966 F.3d at 1281.  Rather, a vocational expert must rely on other sources to find employment statistics, and such sources group jobs by the Standard Occupational Classification ("SOC") system, not DOT codes.  *Id.*  A single SOC group may contain multiple DOT occupations, as the SOC system groups together detailed occupations with similar job duties.  *Id.*  Thus, a vocational expert must (1) determine the number of jobs in an SOC group, and (2) approximate how many of those jobs are the specific job(s) a plaintiff could perform.  *Id.* at 1283.  "In other words, the vocational expert 'must use some method for associating SOC-based employment numbers to DOT-based job types."  *Id.* (citing *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 446 (2d Cir. 2012).  A vocational expert may employ

15

various methods along with his or her expertise in associating the SOC codes to DOT codes. *Id.* at 1283–84 (citing *Purdy*, 887 F.3d at 14–15). Specifically, the vocational expert may use the equal distribution method, which "assumes that the total number of jobs that exist for a given SOC group are distributed equally among the number of DOT occupations within that SOC group." *Id.* at 1284 (citation omitted). Alternatively, the vocational expert may use the occupational density method, which "approximates job numbers using a software program known as JobBrowser Pro from SkillTRAN [that] interprets available data." *Id.* (citation omitted).

Plaintiff contends that the VE's testimony regarding the jobs available in the national economy was not supported by substantial evidence because the VE relied on JobBrowser Pro. ECF No. [27] at 14. Plaintiff argues that JobBrowser Pro has not been granted administrative notice by the Social Security Administration, does not accurately reflect the jobs available in the economy, is unreliable because it uses a "vague" methodology, and "has never been peer reviewed by an individual or entity with a statistical background." *Id.* at 13–17. Plaintiff further argues that because the VE was unable to explain JobBrowser Pro's methodology, the VE's testimony could not be supported by her own experience and expertise. *Id.* At bottom, Plaintiff argues that the ALJ's determination at step five regarding the jobs available in the national economy is not supported by substantial evidence because the ALJ relied on testimony from the VE, who in turn relied on the JobBrowser Pro software.

Defendant responds that the VE's testimony constituted substantial evidence upon which the ALJ could rely. ECF No. [29] at 10. Defendant states that a well-qualified vocational expert can provide testimony that constitutes substantial evidence supporting an ALJ's decision without having to provide data or a statistical explanation. *Id.* Further, Defendant argues that "the VE

properly relied upon Job Browser Pro," as the Eleventh Circuit Court of Appeals has cited Job

Browser Pro as "an acceptable method of identifying the number of jobs."  *Id.*

In support of the proposition that the JobBrowser Pro software is insufficient to provide

substantial evidence at step five, Plaintiff cites out-of-district cases.  *See* ECF No. [27] at 14.

However, the cases do not stand for the broad proposition that the VE cannot rely on JobBrowser

Pro at all, rather they suggest that the VE may rely on the software if she also relies on her

experience and expertise in determining the number of available jobs.  *See Dorman v. Soc. Sec.

Admin.*, No. 4:12-CV-40023, 2013 WL 4238315, at *8 (D. Mass. May 21, 2013) ("[T]his court

finds that the VE's job number testimony did not constitute substantial evidence because it was

based solely on the numbers provided by the Job Browser Pro software and did not reflect any

expertise on his part."); *Poisson v. Astrue*, No. 2:11-CV-245-NT, 2012 WL 1067661, at *9 (D.

Me. Mar. 28, 2012), *report and recommendation adopted sub nom. Poisson v. Soc. Sec. Admin.

Com'r*, No. 2:11-CV-00245-NT, 2012 WL 1416669 (D. Me. Apr. 24, 2012) ("While the vocational

expert may not have known, in precise technical detail, how the Job Browser Pro system worked,

she explained why she thought that the underlying data was reliable and endorsed the numbers

derived therefrom as accurate.  She, thus, relied on her professional experience and expertise, and

not strictly on a software program, in endorsing the numbers provided to the administrative law

judge.   In such circumstances, this court has held vocational testimony as to job numbers

sufficiently reliable to support a Step 5 finding.") (citation omitted); *see also Clark v. Astrue,* No.

CIV. 09-390-P-H, 2010 WL 2924237, at *3 (D. Me. July 19, 2010) (concluding that the VE's

testimony regarding the number of jobs available was not supported by substantial evidence

because the VE relied on "published raw numbers, which pertained not to the specific DOT code-

identified jobs at issue but rather to groups of jobs of differing skill and exertional levels that happened to contain the three specific jobs").

In *Goode*, the Eleventh Circuit considered the methodology employed by ALJs in determining the jobs available in the national economy. 966 F.3d at 1280. The Court in *Goode* remanded the case to the Social Security Administration for reasons unrelated to the VE's reliance on JobBrowser Pro. *Id.* at 1282–85. Specifically, the Court determined that the VE identified the wrong SOC code, which significantly overstated the number of available jobs in the economy. *Id.* at 1282. In addition, the Court held that the VE incorrectly testified as to the number of available jobs within the SOC group in general, which included various DOT job titles that the claimant was not capable of performing. *Id.* at 1283. However, in discussing how DOT job numbers are determined from the SOC group generally, the Eleventh Circuit noted that VEs often use JobBrowser Pro. *Id.* at 1284 ("A [] method [available to vocational experts] is the occupational density method. It approximates job numbers using a software program known as JobBrowser Pro from SkillTRAN, which interprets available data.") (citing *Purdy*, 887 F.3d at 14–15). Indeed, in describing the role of JobBrowser Pro, the Court in *Goode* "did not include the additional requirement that a VE using the occupational density method also specifically testify that the job number estimates were made using her knowledge and experience" because "such a requirement would mandate formulaic testimony from VEs when discussing Job Browser Pro or other software." *Wickline v. Saul*, No. 20-14056-CIV, 2021 WL 862319 (S.D. Fla. Feb. 16, 2021), *report and recommendation adopted sub nom. Wickline v. Comm., Soc. Sec. Admin.*, No. 2:20-CV-14056, 2021 WL 861312, at *9 (S.D. Fla. Mar. 8, 2021). Instead, the Court noted that the VE should "determine the total number of jobs available in the proper SOC group; determine how many DOT codes are included in that SOC group; estimate the number of available jobs for the

particular DOT code; and provide *some explanation* for how she arrived at that latter number." *Id.*
(emphasis supplied and alteration adopted) (citing *Goode*, 966 F.3d at 1284). In short, the holding
in *Goode* took issue with errors that the VE committed in reaching her conclusion, it does not stand
for the broad proposition that Plaintiff makes here. Indeed, the holding in *Goode* suggests "that
the Job Browser Pro software is an acceptable method of fulfilling the latter requirement." *Id.*

Here, Plaintiff does not argue, as the plaintiff in *Goode* did, that there was an error in the
VE's determination of the relevant SOC group or DOT codes. Instead, Plaintiff argues that the
ALJ erred in relying on the VE's opinion, which in turn relied on JobBrowser Pro, in determining
the number of available jobs. However, there is no authority for this broad proposition. Moreover,
although Plaintiff's counsel took issue with the VE's understanding of the intricacies of the
JobBrowser Pro software, Plaintiff did not object to the VE's qualifications and there is no
indication that the VE provided inaccurate information. *See* R. at 951. The VE testified that
statisticians with JobBrowser Pro are tasked with the responsibility of ascertaining the number of
available jobs by assessing the statistics published by the Bureau of Labor Statistics with respect
to each DOT number. *Id.* at 957–60. Indeed, there is no requirement that the VE testify as to the
methodology employed by JobBrowser Pro, rather the VE may simply state that she relied on the
software in determining the number of available jobs. *See Wickline*, 2021 WL 861312, at *9.
Because the VE properly relied on JobBrowser Pro, the ALJ was entitled to rely upon the VE's
testimony without requiring her to provide any additional explanation as to the methodology used
by JobBrowser Pro in determining the number of available jobs. Thus, the undersigned finds that
the VE's testimony provides substantial evidence to support the ALJ's determination at step five.[12]

---

[12] Plaintiff states that the ALJ had an affirmative duty "to identify and to resolve apparent conflicts
between a VE's testimony and information in the DOT." ECF No. [27] at 21 (citing *Washington
v. Comm'r of Soc. Sec.*, 906 F.3d 1353 (11th Cir. 2018)). Although Plaintiff does not specifically

**B.  The ALJ's RFC Finding Is Supported By Substantial Evidence.**

As to the First Disability Period from October 5, 2010 through May 23, 2014, the ALJ determined that Plaintiff had the RFC to perform light work.  R. at 884.  As to the Second Disability Period beginning on May 24, 2014, the same ALJ determined that Plaintiff had the RFC to perform sedentary work.  *Id.* at 1024.  Plaintiff argues that the ALJ's RFC determination in this case for the First Disability Period is not supported by substantial evidence because it "does not take into account all of [Plaintiff]'s functional limitations" and is "inconsistent with a decision issued by the same ALJ for a period at issue beginning just one day after the end of the period at issue in the instant case."  ECF No. [27] at 22–23.  In short, Plaintiff's position hinges on the argument that because the RFC for the First Disability Period is inconsistent with the RFC for the Second Disability Period, substantial evidence does not support the RFC for the First Disability Period.

In support, Plaintiff submitted a chart that provides a side-by-side comparison of the ALJ opinion for each disability period.  *Id.* at 24–29.  First, the chart notes that in both disability periods, the ALJ determined that Plaintiff had the same severe impairments; however, Plaintiff highlights the ALJ's finding that Plaintiff had an additional number of severe impairments in the First Disability Period.  *Id.* at 23–24.  Second, the chart notes that the ALJ made different credibility findings in each disability period because the ALJ determined that Plaintiff's testimony concerning the intensity, persistence, and limiting effects of his symptoms was not consistent with the medical records for the First Disability Period but was consistent with the medical records for the Second Disability Period.  *Id.* at 25.  Third, the chart notes that Dr. Jaen and Dr. Padron's medical records were discounted in the First Disability Period but not mentioned at all in the Second Disability

---

identify any conflicts with the VE's testimony, Plaintiff suggests that the testimony regarding the methodology of JobBrowser Pro lacked reliability.  *Id.* at 21–22.  However, as set forth herein, the VE was entitled to rely on JobBrowser Pro and her testimony regarding the software was sufficient.

Period.  *Id.* at 27–28.  Finally, the chart notes that an opinion rendered by Dr. Loredo in 2013 was considered by the ALJ in both disability periods and given "little weight" in the First Disability Period but "significant weight" in the Second Disability Period.  *Id.* at 28–29.  Based upon the comparisons set forth in the chart, Plaintiff argues that the evidence discounted by the ALJ "support[s] a finding that despite the [Plaintiff]'s impairments, he could perform full-time, competitive work on a sustained basis, especially considering the ALJ's own findings, based on nearly the exact same evidence, beginning just one day later."  *Id.* at 29.

Defendant relies on *Hunter v. Social Security Administration, Commissioner*, 808 F.3d 818 (11th Cir. 2015) in arguing that the ALJ's "subsequent favorable decision is a red herring."  ECF No. [29] at 14–15.  In *Hunter*, the claimant filed "two successive applications for disability insurance benefits."  *Id.* at 820.  Each application was before a different ALJ.  *Id.*  Ultimately, "the second ALJ found that [the claimant] was disabled on February 11, 2012, even though the first ALJ found that she was not disabled just one day earlier on February 10, 2012."  *Id.*  The claimant argued that "the earlier unfavorable decision should be remanded to the Commissioner for further consideration because the second favorable decision constitutes new and material evidence for purposes of § 405(g)."  *Id.* at 821.  The Eleventh Circuit rejected this argument, concluding that:

> there is no inconsistency in finding that two successive ALJ decisions are supported by substantial evidence even when those decisions reach opposing conclusions. Faced with the same record, different ALJs could disagree with one another based on their respective credibility determinations and how each weighs the evidence. Both decisions could nonetheless be supported by evidence that reasonable minds would accept as adequate.  Because of that possibility, the mere existence of a later favorable decision by one ALJ does not undermine the validity of another ALJ's earlier unfavorable decision or the factfindings upon which it was premised.

*Id.* at 822.  Although Defendant may be correct that the subsequent decision by the ALJ may be a red herring, its argument still misses the mark.  In *Hunter*, two *different* ALJs reached different conclusions on credibility.  As the Court correctly noted, two different judges can weigh evidence

and come to different conclusions without either committing error.  Here, of course, the *same* ALJ rendered two different RFC determinations for two different disability periods.

As such, the issue is whether the same ALJ can find that Plaintiff was disabled in one period but not in a second period that is consecutive to the first.  Plaintiff cites to no authority, nor is the undersigned aware of any, that would prohibit the same ALJ from making different determinations in two different periods given that the time frame at issue, and therefore the evidence, would not be the same.  The fact that an ALJ found an impairment more severe at a later time is not inconsistent with that same ALJ finding that the ailment was less severe at an earlier point.  Indeed, unless the ailment is one that a plaintiff had from birth, there is necessarily going to be a date where the disability begins, and therefore, it is necessarily the fact that the day before that day there was no disability.  To that end, the issue here is no different than any other case where the RFC is being challenged: whether substantial evidence support the ALJ's findings.

In making an RFC determination, the ALJ is required to evaluate every medical opinion provided and determine what weight to give the opinion.  20 C.F.R. § 404.1527.  "Medical opinions are statements from physicians . . . that reflect judgments about the nature and severity of the claimant's impairment(s), including the claimant's symptoms, diagnosis and prognosis, what the claimant can still do despite impairment(s), and the claimant's physical or mental restrictions." *Winschel*, 631 F.3d at 1178–79 (quotation marks and alterations omitted) (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).  The ALJ must state with particularity the weight given to the medical opinions provided and the justification for the weight.  *Martinez v. Acting Comm'r of Soc. Sec.*, 660 F. App'x 787, 793 (11th Cir. 2016) (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)).  Absent "good cause," the ALJ must accord the medical opinions of treating physicians

"substantial or considerable weight." *Winschel*, 631 F.3d at 1179.[13]   Good cause exists where: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).   Where good cause exists, the ALJ must clearly articulate the reasons for giving less than substantial or considerable weight to the medical opinion of a treating physician. *Winschel*, 631 F.3d at 1179.

Here, the ALJ determined that Plaintiff had severe impairments in both periods.  As to the First Disability Period, the ALJ determined that Plaintiff had the RFC to perform light work with the following limitations: never kneel or crouch; occasionally crawl or stoop; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently handle, finger, and feel; frequently reach in all directions with the right arm, but never overhead; never operate food controls with the right foot; and never be exposed to vibration, noxious fumes, odors, nasal irritants, work at unprotected heights or work with dangerous machinery.  R. at 884.  In making this RFC determination, the ALJ provided an extensive assessment of Plaintiff's testimony and of the medical opinion of Plaintiff's treating physicians.  *Id.* at 885–92.  The ALJ also provided a detailed account of Plaintiff's consultations with each doctor, the impressions of the doctors, and the medical treatment administered by each doctor.  *See id.*   Ultimately, the ALJ assigned significant weight to the medical opinions of Dr. Torres, Dr. Jorge, Dr. Marin, and Dr. Hommen.

---

[13] As of March 27, 2017, an ALJ is no longer required to give a treating physician's medical opinions controlling weight, rather the ALJ is to apply the same factors in considering all medical opinions.  *See* 20 C.F.R. §§ 404.1520c(a), 404.1527(c), 416.920c(a), 416.927(c). However, because Plaintiff filed his claim in 2012 well before the new SSA regulations went into effect, the new regulations do not apply. *Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1104 (11th Cir. 2021) (noting that the new framework applies to disability claims filed after March 27, 2017).

*Id.* at 891.   The ALJ found that although these opinions reflected that Plaintiff had various medically determinable impairments, they supported a finding that Plaintiff could do light work. *Id.* at 884–86.

To be clear, Plaintiff does not challenge the ALJ's determination as to these doctors. Instead, Plaintiff takes issue with the ALJ's decision to discount his testimony and the opinions of Dr. Jaen, Dr. Padron, and Dr. Loredo given the fact that these were not discounted in the Second Disability Period.   *Id.* at 25–29.   In short, we are directed back to the chart provided by Plaintiff in support of his argument.   The Court will now consider each of the points made by Plaintiff in support of his argument that the differences in the two opinions renders the first one inconsistent and lacking substantial evidence.

First, the fact that the ALJ listed more impairments in the First Disability Period is not dispositive because ultimately, the ALJ found that Plaintiff had severe impairments at step two in both disability periods.   Thus, the issue is not the number of impairments, rather the issue is how the impairments affect the RFC and whether the RFC determination was supported by substantial evidence.   Indeed, an individual could have one severe impairment that at one point in time limits his function in one way, and later in time, have that same severe impairment limit his functional capacity in a more significant way.   Therefore, the fact that the same severe impairments are present in both periods does not render the RFC deficient.   Nor is the RFC rendered deficient by the fact that Plaintiff might have had more impairments in the First Disability Period, as the issue is whether the ALJ's determination of the manner in which those impairments limited his RFC was supported by substantial evidence.   Plaintiff's argument, which rests on the fact that there are differences in the two periods, is not sufficient to find error.

Second, the ALJ's decision to discount Plaintiff's testimony regarding the severity of his impairments in the First Disability Period but not in the Second Disability Period is also a non-issue.  Indeed, the ALJ evaluated Plaintiff's testimony for two different disability periods.  As to the First Disability Period, the ALJ discounted Plaintiff's testimony because he determined that Plaintiff's statements were not consistent with the medical records for that particular disability period.  R. at 885–86.  As to the Second Disability Period, the ALJ determined that Plaintiff's testimony as to impairments for that particular disability period were consistent with the medical records for that period.  *Id.* at 1025.  Because the ALJ evaluated Plaintiff's testimony in light of two different disability periods, the ALJ did not err in making two different findings as to the weight to be afforded to Plaintiff's testimony because his testimony as to his ailments was being compared in two different period against two different records.

Third, Plaintiff argues that the ALJ erred in affording partial weight to the opinion of Dr. Jaen and little weight to the opinion of Dr. Padron in the First Disability Period because the ALJ failed to mention these doctors in the Second Disability Period.  ECF No. [27] at 27–28.  Again, the Court's consideration is limited to whether the ALJ's decision in this period was supported by substantial evidence.  Indeed, Plaintiff does not argue that the ALJ erred in evaluating Dr. Jaen or Dr. Padron's opinions in the subject disability period.  Instead, Plaintiff compares the findings of the ALJ in the First Disability Period with the fact that the ALJ did not mention these doctors in the Second Disability Period.  However, the ALJ's assessment of the medical evidence in the Second Disability Period is of no moment because it has no bearing on the weight of the evidence in the First Disability Period.  Because the ALJ sufficiently evaluated the opinions of Dr. Jaen and Dr. Padron in this disability period and because Plaintiff does not argue that the ALJ erred in doing so, the ALJ's opinion is supported by substantial evidence.

Finally, Plaintiff takes issue with the ALJ's decision to afford Dr. Loredo little weight in the First Disability Period but significant weight in the Second Disability Period.  ECF No. [27] at 28–29.  Dr. Loredo's opinion consists of a certification in support of an Application for Disabled Parking Permit and an attached Residual Functional Capacity Questionnaire.  R. at 619–21.  In the opinion for the First Disability Period, the ALJ gave little weight to Dr. Loredo's opinion because the "process and standards for a disabled parking permit differ from that for Social Security disability benefits" and "findings of disability are reserved for the Commissioner."  *Id.* at 891.  In addition, the ALJ noted that the Questionnaire was unsigned and undated but that, even assuming that the Questionnaire was completed by Dr. Loredo, "it is more extreme than warranted by his treatment notes, limited period of treatment, and the totality of the evidence."  *Id.* at 891.  In the decision for the Second Disability Period, the same ALJ considered the same opinion issued by Dr. Loredo, noting the certification that Plaintiff "has severe limitation in his ability to walk and that [Plaintiff] is limited to sedentary exertion" and the Questionnaire's assertion that Plaintiff "would be absent from work more than four times a month due to his impairments."  *Id.* at 1026.  The ALJ afforded significant weight to this opinion, finding that it was consistent with the overall record and Plaintiff's functional limitations.  *Id.*

Plaintiff's argument, therefore, is that because the same ALJ evaluated the same document in two different instances and reached different conclusions, the ALJ's opinion lacks substantial evidence.  However, what Plaintiff fails to note is that the medical opinion was weighed against the medical records and evidence in two different periods of time.  Specifically, in the opinion regarding the First Disability Period (at issue here), the ALJ assigned little weight to the opinion because it was "more extreme than warranted by his treatment notes, limited period of treatment, *and the totality of the evidence.*"  *Id.* at 891 (emphasis added).  In making this statement, the ALJ

cited the entire record for the First Disability Period.  *Id.*  Plaintiff does not challenge this determination, rather Plaintiff only challenges that the same opinion was given a different weight in the Second Disability Period.[14]  However, in the Second Disability Period, the ALJ gave significant weight to Dr. Loredo's report based on the finding that the medical opinion was consistent with the overall record *for that time period*.  *Id.* at 1026.  Thus, the contrasting weight afforded to Dr. Loredo's opinion is attributed to the fact that in one time period it was inconsistent with the medical records, and in the other time period it was not.  Of course, how the ALJ evaluates evidence in each time period is guided by the medical records, and the medical records in each time period are different because they address different periods of time.  Because the reason that the ALJ gave for affording less weight to Dr. Loredo in the First Disability Period, that the findings were not consistent with the record, was sound and is unchallenged here, the Court finds that there is no basis to conclude that the ALJ's opinion lacked substantial evidence.

## IV.     RECOMMENDATION

In accordance with the foregoing Report and Recommendation, the undersigned hereby **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. [27], be **DENIED** and that Defendant's Motion for Summary Judgment, ECF No. [28], be **GRANTED**.

## V.      OBJECTIONS

A party shall serve and file written objections, if any, to this Report and Recommendation with the District Court, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation.  Failure to timely file objections will bar a *de novo* determination by the

---

[14] The ALJ's first decision as to the First Disability Period, which was later remanded, also discounted this same medical opinion, finding that the record did not support such an extreme determination.  *Id.* at 39.  Notably, Plaintiff did not raise any challenge to the fact that the ALJ discounted Dr. Loredo's treatment notes in his first appeal to this Court.

District Judge of anything in this Recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

**DONE AND SUBMITTED** in Chambers at Miami, Florida on April 1, 2022.

**JACQUELINE BECERRA**
**United States Magistrate Judge**